Marcella L. Gutierrez, SBN 214224
Tilman A. Heyer, SBN 315566
**GUTIERREZ, PERRY & VILLARREAL, LLP**
1610 R St., Ste. 310
Sacramento, CA 95811
Telephone:      (916) 546-7774
Email:          marcy@gpvlaw.com
Email:          tilman@gpvlaw.com

Attorneys for Plaintiff
ROCKLIN UNIFIED SCHOOL DISTRICT

UNITES STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROCKLIN UNIFIED SCHOOL DISTRICT,<br><br>      Petitioner,<br><br>    vs.<br><br>B.V. (a minor), by and through his Guardians ad Litem, BRITTANY MARSHALL and EARL VICKERS,<br><br>      Respondents. | Case No.<br><br>**COMPLAINT FOR PARTIAL REVERSAL OF ADMINISTRATIVE SPECIAL EDUCATION DUE PROCESS HEARING DECISION PURSUANT TO 20 U.S.C. § 1415** |

Plaintiff Rocklin Unified School District (hereinafter "District") alleges as follows:

## INTRODUCTION

1.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this case arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*  The District is aggrieved by a decision rendered in a special education administrative due process hearing conducted by the State of California's Office of Administrative Hearings ("OAH"), and hereby appeals one portion of that decision pursuant to 20 U.S.C. § 1415(i).

2.      OAH's decision at issue ("Decision") was rendered by Administrative Law Judge ("ALJ") Cararea Lucier on April 27, 2022, after an administrative due process hearing that lasted five days.  A true and correct copy of the Decision is attached hereto as Exhibit "A" and incorporated herein by reference.  The Decision addressed one sole issue, concerning implementation of Defendant B.V.'s[1] ("Defendant") individualized health care plan during an approximately 30-minute period on December 2, 2021, as raised by Defendant in the underlying due process hearing, and as identified by the ALJ in the Decision as Issue 1.  The ALJ found Student prevailed on this issue.

3.      While Defendant sought many remedies in the underlying due process hearing, the ALJ ordered only two remedies: (1) 60 hours of compensatory education; and (2) a six-hour staff training on seizures and individual health care plans, to be presented to all teachers, paraprofessional classroom aides, and health technicians districtwide (hereinafter "Training Remedy").  By this Complaint, the District appeals the Training Remedy, both as to the duration and scope of staff training ordered.  The District does not appeal the findings or conclusions unrelated to the Training Remedy in the Decision.

## PARTIES

4.      The District is a California public school district, and thus is a political subdivision of the State of California.  As such, the School District is a local education agency ("LEA") responsible for providing a free and appropriate public education ("FAPE") to eligible students with disabilities pursuant to the IDEA.

---

[1] Pursuant to Local Rule 140, Defendant B.V. is identified by his initials because he is a minor.

COMPLAINT FOR PARTIAL REVERSAL OF
DUE PROCESS HEARING DECISION                                              RUSD v. B.V.

5.     Defendant is a 12-year-old student who was a "resident" of the District, as defined in California Education Code §§ 48200 and 48204, since on or about the beginning of the 2021-2022 school year, until at least on or around March 9, 2022.  Defendant disenrolled from the District on or around March 9, 2022, and, on information and belief, the District understands he is no longer a resident of the District.  During his time in the District, Defendant qualified for special education and related services pursuant to the IDEA eligibility category of Multiple Disabilities.

6.     Defendants Brittany Marshall and Earl Vickers (collectively, "Parents") are the parents of Defendant.  Between Defendant's entry into the District, until December 23, 2021, Defendant resided with his mother.  The District is not aware whether Defendant's father cohabited with him.  On December 23, 2021, Defendant was detained from his mother's care by Child Protective Services due to imminent threat of physical danger from continuing to stay in her custody.  From December 23, 2021 through the end of the due process hearing in this matter, Parents retained partial legal custody of Student, including educational decision-making rights, but did not have physical custody of Defendant. The District is unaware of Parents' current custodial rights.  Both Parents brought the subject due process case on Defendant's behalf.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction over this action pursuant to 20 U.S.C. § 1415(i)(2)(A) and 28 U.S.C. § 1331.  The District is a party aggrieved by the Decision and thus has standing to bring this action.

8.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as all Defendants reside within the Eastern District of California, the District is located within the Eastern District of California, and events leading to the Decision and which are the subject matter of this Complaint took place within the Eastern District of California.

## STATUTORY BACKGROUND

9.     The IDEA exists to provide students with disabilities access to a FAPE.  An individualized education plan ("IEP") is a written document setting forth the supports provided to the student to ensure he or she receives FAPE.  FAPE must include a program designed to meet the unique

COMPLAINT FOR PARTIAL REVERSAL OF
DUE PROCESS HEARING DECISION                                    RUSD v. B.V.

needs of the student.  20 U.S.C. § 1400(d)(1).  Unique needs are broadly interpreted to include "academic, social, health, emotional, communicative, physical, and vocational needs." *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1500 (9th Cir. 1996).

10.    Generally, a district must implement a student's IEP with all required components.  34 C.F.R. § 300.323(c).  However, this implementation mandate does not mean that a district must perfectly implement or adhere to a student's IEP in order to provide the student with a FAPE.  Only a "material" failure in implementing an IEP, or more than a "minor discrepancy" between the services a school provides to a student and the services required by the student's IEP, constitutes a denial of a FAPE.  *Van Duyn v. Baker School District*, 502 F.3d 811, 822 (9th Cir. 2007).  "Special education and related services need only be provided in conformity with the IEP" and "there is no statutory requirement of perfect adherence to the IEP, nor any reason in the statutory text to view minor implementation failures as denials of a free appropriate public education."  *Id.* at 821 (internal quotations marks omitted).

## FACTUAL BACKGROUND

11.    Student began his school attendance in the District at the District's Breen Elementary School ("Breen") site on September 8, 2021.  During the entirety of his time in the District, Defendant's placement was the Independent Living Skills ("ILS") moderate-severe special day class ("SDC") program at Breen.  At the time of the due process hearing, the ILS classroom had six students, three aides, and one classroom teacher.

12.    The operative IEP in the matter was dated October 5, 2021, and included an individual health care plan.  Student has a seizure disorder and his individual health care plan addressed how staff should respond in the event he had a seizure at school.

13.    Student had a series of seizures at school on December 2, 2021.  According to medical investigation, this occurred because Parents did not provide Student with one of his seizure medications. While District staff testified that the seizure lasted about two or three minutes, the ALJ's concluded that the seizures occurred from approximately 1:00 p.m. to 1:30 p.m.  Upon recognizing Student had a seizure, the ALJ recognized that school staff responded to assist Student in several ways, including: (1)

by attempting to reach a parent; (2) calling District health staff; (3) monitoring Student; and (4) ensuring Student was comfortably seated and relaxing.  While District staff testified about their knowledge and implementation of Student's health cate plan, the ALJ found one classroom aide and Student's classroom teacher did not fully implement his health care plan, because they did not call 911.  The ALJ also concluded the District did not timely call Parents[2], but neither the Decision nor Student's health care plan specify the timeframe in which Parents should be called.

14.     When Defendant's mother arrived on campus, she explicitly told staff she did not want 911 called.  Student's mother put Student in her own vehicle, and took Student to a nearby grocery store parking lot, where she called 911, waited for an ambulance to arrive, and then rode with Defendant in the ambulance to a local hospital.

15.     Medical records show Defendant was suffering a seizure upon arrival to the hospital. Hospital staff ran tests and conclusively determined the cause of the seizure was  "from running out of Onfi," a medication that was supposed to be exclusively administered by Parents, and not at school. Onfi belongs to a class of medications known as benzodiazepines, commonly referred to as a "benzo." Hospital staff restricted the amount of Onfi that Parent could receive  "because Onfi is a potential drug of abuse."  Of the three seizure medications prescribed to Student, Onfi was the only medication not present in his system at the time he was at the hospital.

16.     Fortunately, Student recovered quickly from his seizure.  He was admitted at the hospital at 2:21 p.m. on December 2, 2021, and discharged the same day at 6:44 p.m.  Medical records indicate Student was slightly groggy from medication administered at the hospital, but otherwise "back to baseline" in all regards.  Parent, during her testimony at the due process hearing, agreed with this medical assessment.

17.     Parent kept Student home from school for the remainder of December 2021, and he missed eleven school days total.

---

[2] District staff first called Parent approximately ten minutes after first noticing possible symptoms of a seizure.

COMPLAINT FOR PARTIAL REVERSAL OF
DUE PROCESS HEARING DECISION                                                          RUSD v. B.V.

18.     On December 23, 2021, Student was detained from Parents' care by child protective services.  Student was removed from Parents' custody as "detention [was] necessary to prevent imminent physical damage or harm to the child."  Social workers later told District staff that the hospital filed a report of child abuse and neglect against Parents for failure to administer seizure medication, which led to Student's detention.  He remained in foster care through the end of his tenure in the District on March 9, 2022.  However, Parents retained educational decision-making rights for Student.  Using these educational decision-making rights, Defendant's mother disenrolled him from the District on March 9, 2022, and began homeschooling him.

19.     A due process hearing was held before ALJ Lucier on February 15-17, 2022 and March 8-9, 2022.  A single issue was heard, regarding implementation of Student's health care plan.  By way of the evidence presented at hearing, Defendant alleged the District did not implement the health care plan only on December 2, 2021, from approximately 1:00 p.m. to 1:30 p.m.

20.     The ALJ found the health care plan was not fully implemented by Defendant's classroom teacher and one classroom aide.  The ALJ recognized that, "Student did not provide any evidence regarding compensatory education."  Nonetheless, the ALJ ordered sixty hours of compensatory education to Student, reasoning that this compensated Student for the eleven school days of attendance missed, when Student's mother chose not to send him to school, following the December 2, 2021 seizure incident.  To date, Parent has not accessed any of these compensatory services, although the District sent her a letter offering to provide such services.

21.     At issue in this appeal is the Training Remedy ordered by the ALJ.  Student never requested staff training as a remedy in his underlying due process complaint, or in any other filing with OAH, including his closing brief in the underlying due process hearing.  No evidence was heard at hearing regarding the need for staff training or its length.  Without explanation for how the ALJ arrived at the scope or duration of the staff training ordered, the Decision ordered six hours of staff training on seizures and health care plans for the following school staff:

- All teachers in the District, both general and special education teachers;

- All paraprofessional classroom aides in the District; and

- All health technicians in the District.

While the ALJ faulted only two individual employees for failing to implement a portion of the health care plan during a thirty-minute span on one school day, the ALJ ordered staff training for likely over 2,000 District employees, spanning all of the District's nineteen school sites.

22.    Student disenrolled from the District on March 9, 2022.  Parent testified regarding his disenrollment during the due process hearing.  Student is not believed to reside within District boundaries any longer.  He cannot benefit from this remedy.

23.    The Training Remedy has no benefit to Defendant, but on balance also harms students in the District.  Seizure disorders are rare in children.  0.6% of children have active epilepsy, or six out of every 1,000.  The overwhelming majority of District teachers do not have a student with a seizure disorder in their classrooms, yet the ALJ all ordered they all attend a six-hour training on the topic.  The Epilepsy Foundation's recommended training on seizures for school staff is one hour long, not six, as the ALJ ordered.

24.    Should the District have to provide the ordered training remedy in the duration and scope written by the ALJ, it would remove teachers and staff from classrooms, and disrupt school operations. It is nearly impossible to provide training in such length and scope without District students missing significant instructional time.  This harms District students.  It particularly harms those coming from disadvantaged backgrounds, and students with disabilities, who research shows disproportionately suffered learning loss due to school closures occurring because of the COVID-19 pandemic.

25.    The District exhausted all administrative remedies to the extent required.

## CAUSES OF ACTION

## (20 U.S.C. § 1415 (i)(2)(a))

26.    The District incorporates by reference as though set forth fully herein paragraphs 1-25.

27.    The ALJ's Decision is, in part, not thorough or careful.  Accordingly, these parts of the Decision should not be granted deference upon review.

28.    The ALJ improperly ordered six hours staff training for all District teachers, classroom aides, and health technicians.  No evidence supported ordering such a remedy in the length and breadth

COMPLAINT FOR PARTIAL REVERSAL OF
DUE PROCESS HEARING DECISION
RUSD v. B.V.

ordered by the ALJ.  Student never requested nor set at issue the appropriateness of his health care plan or whether staff were properly trained to implement it.  This staff training remedy was not appropriate relief under the IDEA given the findings reached by the ALJ and the facts in the record.

29.     The ALJ made errors of fact and law concluding six hours staff training for all District teachers, classroom aides, and health technicians was appropriate relief in this case.

## **PRAYER**

WHEREFORE, Plaintiff respectfully prays for the following relief:

1.     That the Court reverse the Decision as to the Training Remedy, or in the alternate, modify such remedy, both in the breadth of staff ordered to undergo such training, and the length of the training itself.

2.     That the Court find that the Decision was not thorough and careful with regards to the ordered Training Remedy.

3.     That the Court order such other and further relief as may be just and proper.

Dated: July 26, 2022               Respectfully submitted,

**GUTIERREZ, PERRY & VILLARREAL, LLP**

/s/ Marcella L. Gutierrez
MARCELLA L. GUTIERREZ
TILMAN A. HEYER
Attorneys for Plaintiff
ROCKLIN UNIFIED SCHOOL DISTRICT

EXHIBIT A

BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

_____

CASE NO. 2021120714

_____

PARENT ON BEHALF OF STUDENT,

v.

ROCKLIN UNIFIED SCHOOL DISTRICT.

_____

# DECISION

April 27, 2022

On December 21, 2021, the Office of Administrative Hearings, called OAH, received a due process hearing request from Parent on behalf of Student, naming Rocklin Unified School District and Elk Grove Unified School District.  OAH granted a continuance on January 31, 2022.  On February 8, 2022, OAH dismissed Elk Grove Unified School District upon Student's request.  Administrative Law Judge Cararea Lucier heard this matter by videoconference on February 15, 16, and 17, and March 8 and 9, 2022.

Sheila Bayne, Constance Zarkowski and Robert Burgermeister, attorneys at law, represented Parent and Student.  Parent attended all hearing days on Student's behalf.

1

Tilman Heyer and Marcy Gutierrez, attorneys at law, represented Rocklin Unified School District.  Crista Burke, Interim Director of Special Education, attended all hearing days on Rocklin's behalf.

The matter was continued to April 4, 2022, for written closing briefs.  The record was closed and the matter submitted on April 4, 2022.

## ISSUE

1.  Did Rocklin Unified School District deny Student a free appropriate public education, referred to as FAPE, by failing to follow Student's health plan incorporated by reference in the October 5, 2021, Individualized Education Program, referred to as IEP?

In this matter the parties used the terms "individualized health plan," "health care plan," and "health plan" interchangeably to describe Student's health plan dated October 5, 2021.

## JURISDICTION

This hearing was held under the Individuals with Disabilities Education Act, its regulations, and California statutes and regulations.  (20 U.S.C. § 1400 et seq.; 34 C.F.R. § 300.1 (2006) et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.) The main purposes of the Individuals with Disabilities Education Act, referred to as the IDEA, are to ensure:

- all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living, and

- the rights of children with disabilities and their parents are protected.  (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, assessment, or educational placement of the child, or the provision of a free appropriate public education to the child.  (20 U.S.C. § 1415(b)(6) & (f); 34 C.F.R. § 300.511 (2006); Ed. Code, §§ 56501, 56502, 56505; Cal. Code Regs., tit. 5, § 3082.)  The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents, and has the burden of proof by a preponderance of the evidence. (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i); *Schaffer v. Weast* (2005) 546 U.S. 49, 57-58, 62 [126 S.Ct. 528, 163 L.Ed.2d 387]; and see 20 U.S.C. § 1415(i)(2)(C)(iii).) Student had the burden of proof in this matter.  (*J.G. v. Department of Education* (9th Cir. 2019) 772 Fed.Appx. 567.)  The factual statements in this Decision constitute the written findings of fact required by the IDEA and state law.  (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).)

Student was a 12-year-old boy who resided within Rocklin Unified School District with his mother from September 8, 2021, through December 23, 2021.  Student continued to be a student of Rocklin when he resided with foster parents from December 24, 2021, through the dates of this hearing.  He qualified for special education and related services under the eligibility category of multiple disabilities.

ISSUE 1: DID ROCKLIN UNIFIED SCHOOL DISTRICT DENY STUDENT A FAPE BY FAILING TO FOLLOW STUDENT'S HEALTH PLAN INCORPORATED BY REFERENCE IN THE OCTOBER 5, 2021 IEP?

Student contends that Student's health care plan of October 5, 2021, was a key component of Student's IEP that Rocklin did not follow for 34 minutes on December 2, 2021.  Student asserts that Student exhibited symptoms of a seizure for the entirety of the 34-minute period, and that Rocklin did not follow the steps outlined in Student's health care plan, thereby denying him a FAPE.  In his closing brief Student argues that he is entitled to various remedies, including $380,000.00 in funds for compensatory education, in addition to compensatory services and funding for private assessments.

Rocklin contends that Student may have had a brief seizure on December 2, 2021, but that Rocklin's staff implemented Student's health care plan with fidelity.  Rocklin argues that it was not required to call 911.  Although Student may have had a two to three-minute seizure, the health care plan specified that staff was required to call 911 in the event of a five-minute seizure, or because of other conditions that did not occur in this case.  Rocklin also contends that Student did not suffer any lasting harm from the events, that Student did not meet his burden of proof with respect to remedies, and that Parent was, in Rocklin's view, an unreliable witness.

A FAPE means special education and related services that are available to an eligible child that meets state educational standards at no charge to the parent or guardian.  (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17 (2006).)  Parents and school personnel develop an IEP for an eligible student based upon state law and the IDEA.  (20 U.S.C.

§§ 1401(14), 1414(d)(1); and see Ed. Code, §§ 56031,56032, 56341, 56345, subd. (a) and 56363 subd. (a); 34 C.F.R. §300.501.)

In general, a child eligible for special education must be provided access to specialized instruction and related services which are individually designed to provide educational benefit through an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.  (*Board of Education of the Hendrick Hudson Central School Dist. v. Rowley* (1982) 458 U.S. 176, 201-204; *Endrew F. v. Douglas County School Dist. RE-1* (2017) 580 U.S. ___ [137 S.Ct. 988, 1000].)

In California, related services include health and nursing services.  (Ed. Code § 56363, subd. (b)(12).)  Health and nursing related services include managing an individual's health problems on the school site.  (Cal. Code Regs., tit. 5, § 3051.12(a)(2).) Schools must provide appropriate accommodations for the safety and necessary physical care for individuals with disabilities, while simultaneously assuring the personal privacy and dignity of such individuals.  (Cal. Code Regs., tit. 5, § 3051.12(b)(3)(B).)

A school district violates the IDEA if it materially fails to implement a child's IEP. (20 U.S.C. § 1401(9).)  A material failure occurs when there is more than a minor discrepancy between the services provided to a disabled child and those required by the IEP.  (*Van Duyn v. Baker School Dist.* (9th Cir. 2007) 502 F.3d 811, 815, 822.)  However, "[T]he materiality standard does not require that the child suffer demonstrable educational harm in order to prevail." (*Ibid.*)

On November 24, 2009, Student was born prematurely at 24 weeks gestation, weighing one pound seven ounces.  He remained in the neonatal intensive care unit for the first 10 months of his life.  Student was born with numerous disabilities and medical conditions.

At birth, Student suffered from a buildup of excess cerebrospinal fluid in his brain, resulting in a diagnosis of Congenital Hydrocephalus.  Doctors surgically implanted a ventriculoperitoneal, referred to as VP, shunt that runs from his head, behind his ear, down his chest, into his small intestine to drain the excess fluid.

Student had Cerebral Palsy.  He was partially paralyzed on the right side of his body, resulting in mobility difficulties.  He wore AFO leg braces and a splint on his right hand and thumb.  He could transition in and out of a wheelchair independently.

Student was visually impaired.  The lens of his left eye was removed due to glaucoma.  He was farsighted and could perceive light out of his left eye and objects out of his right eye.  Student was nonverbal.  He communicated using gestures, facial expressions, American Sign Language, and an augmentative and alternative communication, referred to as AAC, device.

Student had a seizure disorder, Epilepsy, with a history of petit mal seizures. Student began having seizures at age two and suffered over 20 seizures in his life.  At times, Student has had consecutive seizures, with each seizure lasting 30 seconds to one minute.  Historically, Student's seizure symptoms have included shortness of breath, head moving to one side, and darting, widened eyes.  Student took several medications for his seizure disorder, including Keppra, Topamax, and Onfi.

Student attended school in Elk Grove Unified School District, located in Sacramento County, prior to moving to the Rocklin area.  On May 27, 2021, Elk Grove held Student's annual IEP review meeting.  Student qualified for special education and related services under the category of multiple disabilities.  Elk Grove described Student as a happy and social young man with a goofy sense of humor.  His favorite activity was dancing and watching music videos.  His team noted, "He mostly likes to rock out to

6

music!"  Elk Grove's IEP included a health plan with instructions in case he had a seizure at school.

On or around September 8, 2021, Student and his mother moved to a residence within the boundaries of Rocklin Unified School District, within Placer County.  On September 8, 2021, Rocklin developed an interim 30-day IEP and Student began attending sixth grade at Breen Elementary School.  Rocklin placed Student in an independent living skills, referred to as ILS, special day class for fourth through sixth graders.  The ILS class was located in a portable classroom, divided into two rooms and a restroom.  The front room of the classroom was the main instructional area.  The second room was used as a sensory break room, with the restroom at the back.  The class had six students, one teacher, and two to three paraprofessional aides.

Brandi Flanagan taught the grade 4-6 ILS class at Breen Elementary.  She was a credentialed teacher with 18 years' experience teaching special education, primarily in Maine and Massachusetts.  Flanagan began working at Rocklin on September 30, 2021 and her first day in Student's classroom was October 5, 2021.  On the witness stand, Flanagan presented as a caring educator who was concerned for Student.  However, Flanagan was evasive and often dodged direct questions or gave vague non-answers. When asked straightforward questions about Student's health care plan she became visibly nervous and uncomfortable.  As such, Flanagan was not a highly credible witness and her testimony was given diminished weight.

On October 5, 2021, Rocklin convened a 30-day review IEP for Student.  Jennifer Palmer, Principal of Breen Elementary, ran the IEP team meeting because Student's case manager, Flanagan, was not yet familiar with the protocols in Rocklin and in California. Rocklin updated Student's present levels of performance that had been previously developed at Elk Grove.  The IEP team developed an IEP for Student with annual goals,

7

placement at Breen Elementary, and related services.  At the October 5, 2021 meeting, the team discussed Student's health needs and his health care plan.  Nurse Julianne Gonzalez attended the meeting and developed his health care plan, with input from Parent.  The parties agree that Student's individualized health plan, dated October 5, 2021, was incorporated by reference into Student's IEP of October 5, 2021. Parent consented to the October 5, 2021, IEP without limitation.

## STUDENT'S HEALTH CARE PLAN

Student's health plan required the school to take specific actions to protect Student's health and safety at school.  The health plan included general directions, as well as more specific protocols relating to seizures and Student's VP shunt.

The first instruction in the health care plan, which was bolded and in a larger font, stated: "If you notice any behavior that is unusual for the child notify the parents and nurse."  Additionally, the plan included directives regarding toileting and ambulation. Student was encouraged to walk, but a wheelchair was needed when he left the classroom.  If Student became unresponsive, severely confused, or unconscious, the school staff was required to call 911.

If Student became nauseous, vomited, was unusually lethargic, or feverish, these were possible symptoms of a VP shunt failure.  Additionally, headaches, double vision, bulging eyes, or redness along his shunt tract on his scalp, were all symptoms of a possible shunt failure.  School staff was required to monitor Student for these symptoms.  If he displayed any of these symptoms, school staff was required to call Parent immediately.  In bolded, italicized text, the plan repeated the directive that if Student became unresponsive, severely confused, or unconscious, the school staff was required to call 911.

Student's seizures were a critical focus of the health plan and school staff's obligations to Student.  If Student stopped what he was doing, had a blank stare, or fluttering eyelids, he was displaying symptoms of a possible absent (petit mal) seizure. Staff was required to stay with Student; observe and document the time and symptoms; call Student by his name and allow him to refocus and rest; and report the seizure activity to Parent.  If Student became jerky, was shaking, or had a stiffening of all or parts of his body, he was showing symptoms of a possible tonic clonic (grand mal) seizure.  For symptoms of grand mal seizures, staff was required to stay with Student without attempting to stop the seizure, and to protect him by easing him to the floor, loosening restrictive clothing, and removing any hard or sharp objects nearby.

School staff was required to call for another staff member to follow five steps if Student showed signs of any type of seizure.  First, school staff was required to note the time the seizure started and ended, using a seizure log.  Next, the school was required to notify the nurse and parents.  Then, the school staff was required to reference a document called "First Aid for Seizures" for guidance while waiting for help.  This document described common signs of a seizure such as blank staring, chewing, fumbling, wandering, shaking, and confused speech.  The document advised school staff to time the seizure, speak calmly, explain the situation to others, block hazards, and avoid holding or grabbing the child.

Finally, the health plan required the school to call 911 if the seizure symptoms lasted longer than five minutes, or if Student was injured, hit his head, had difficulty breathing or turned blue, if the seizure happened in water, or if additional seizures happened before Student woke up.  Student's health care plan did not require school staff to diagnose or confirm seizures.  Rather, school staff was required to be familiar with symptoms of potential seizures and to respond as described in the health care plan.

Student's health care plan also included a health history, which provided the school staff with additional information and context for Student's health needs at school.  Student had a history of petit mal seizures, with the most recent seizure two months prior in August of 2021.  When Student had a petit mal seizure, he might stare blankly, stop what he was doing, and flutter his eyelids.

## MEDICAL INCIDENT ON DECEMBER 2, 2021

At around 1:00 p.m. on December 2, 2021, Student was sitting on the toilet in the restroom of his classroom when he lost control of his extremities.  He had previously requested to use the restroom by pointing to a symbol on his communication board.  His classroom teacher, Brandi Flanagan, assisted him to the classroom restroom and found that he had a wet pull up.  Student sat on the toilet while she changed his lower clothes.  Flanagan attempted to stand Student up to pull up his undergarment and clothing.  Student initially held on to the handicapped bar in the restroom, then let go and could not bear his own weight.  Flanagan maintained Student's balance and supported his weight.  She cued him to stand but he did not.  Flanagan lowered Student back down to the toilet.  Student did not respond to her verbal prompts.  Flanagan was concerned as his behavior was atypical.  Student continued to be unresponsive for approximately two minutes.

Flanagan was concerned for Student but did not follow Student's health care plan as required at approximately 1:02 p.m. on December 2, 2021.  Student's health care plan stated in large bolded letters: "If you notice any behavior that is unusual for the child notify the parents and nurse."  Flanagan observed what she believed to be markedly unusual behaviors but did not call his parents or a nurse.  Student's health care plan said several times that if Student became unresponsive staff should call 911.  Student was unresponsive for approximately two minutes, but Flanagan did not call 911.  Student's

health care plan stated that if Student stopped what he is doing, that is a sign he was having a petit mal seizure.  Student stopped holding on to the restroom bar and lost control of his body.  Furthermore, Flanagan did not start timing the seizure symptoms. The restroom had no clock, Flanagan was not wearing a watch, and did not have her phone with her.

Flanagan called out from the restroom for a classroom aide to assist her with Student, but the aides did not hear her.  Flanagan was unsure if Student was having a seizure.  At the time of the incident, Flanagan had known Student for around 8 weeks. His behaviors were not typical for him, but he was a child with multiple, complex medical needs.  Flanagan lifted Student off the toilet and placed Student on a standard classroom chair located in the restroom.  Maintaining visual contact on Student, Flanagan called for help from classroom aide Kate Aguilar.

Student's eyelids fluttered as he sat in the classroom chair.  He made unusual vocalizations that sounded like a moan.  Student turned his head to the right, and his eyes went all the way to the right.  Flanagan waved her hand close to his face and he blinked.  He reached for her hand.  His leg was shaking.  Flanagan was concerned he might be having a seizure.

Aguilar arrived and observed Student sitting in the blue plastic classroom chair visibly in distress with a tense body.  She agreed his behavior was not normal, and nothing she had observed of him previously.  Student occasionally made eye contact, but his legs continued to shake slightly, even as they were bent in a seating position. Student had an unusual look on his face, with his jaws clenched, eyes wide open, and head moving to the right side.

Approximately four minutes had elapsed from the time Student lost control of his extremities.  Student displayed every symptom of a seizure listed in his health care plan. He had unusual behavior.  His eyelids fluttered.  He stared to the right with wide eyes. Student's legs were shaking.  His body was tense.  Flanagan and Aguilar did not follow the Health Plan as required at approximately 1:04 p.m. on December 2, 2021. Additionally, school staff failed to time his symptoms and call the nurse.

Flanagan finished dressing Student and asked him if he would like to go back to the classroom.  Student looked at the door and stood up, which Flanagan interpreted as "yes."  Flanagan put one arm around his waist to support him on the side he is paralyzed, and holding his hand with her other hand, ambulated him back to the primary classroom.  She settled him into a bean bag chair and placed his iPad in his lap.

Sitting in the bean bag chair, Student began turning his head and eyes to the side and clenching his jaw.  This was unusual for him.  Student made a hand gesture, which Flanagan interpreted as an adaptation of the American Sign Language sign for "help."  Student scrolled through the iPad, but did not stay on an application very long, which was unusual behavior for him.  Student made several coughing sounds, so Flanagan assessed him to determine if he was choking.  She decided he was not.

At around 1:08 p.m., Aguilar called the front office to explain the situation and their concerns and was told staff would contact the nurse and Parent.  Amy Miller, front office clerk at Breen Elementary, called district lead nurse, Health Services Supervisor Melissa Locketz.  Locketz said she would come as soon as possible but she was not nearby, so they should call 911 unless Student's health plan stated otherwise.  Miller also called Parent.  Parent was having lunch with Student's father but said she would come right away to pick him up and would be there in 10 to 15 minutes.

At this point, Student had been displaying symptoms of seizure activity for eight minutes.  Student's health care plan required school staff to call 911 if seizure activity lasted over five minutes.  Flanagan did not call 911 because he was breathing, communicating, and accessing his iPad.  In the course of the eight minutes he had ambulated across the room with support and made gestures she believed to be communication.  For these reasons, she was unsure if he was having a seizure and she wanted guidance from a health professional.

At around 1:10 p.m., Julianne Gonzalez, Licensed Vocational Nurse for Rocklin, was at Sunset Ranch Elementary School when she received a phone call from Joy Gladden, the assistant to the Principal of Breen Elementary.  Gonzalez had around 10 years' experience as a Licensed Vocational Nurse, referred to as LVN.  She had significant experience and training related to seizures.  At the time of the hearing, Gonzalez no longer worked for Rocklin.  She resigned from Rocklin on December 17, 2021, because she did not agree with the district's protocols relating to COVID-19. Gonzalez was compelled to testify in the hearing pursuant to a subpoena.  Her demeanor was hostile and at times sarcastic.  Nonetheless, she appeared to be candid in her responses and confident and careful in her professional opinions.  She did not appear to have been coached as a witness.  As such, her testimony to percipient facts was highly credible and given significant weight, although she was clear that she was not familiar with Student or his baseline behaviors.

Gladden told Gonzalez that staff at Breen suspected Student may have had a seizure.  They were afraid and needed someone to tell them what was going on. Student was new to Breen Elementary.  They understood his behavior was not baseline, but they were unsure about whether he was having a seizure.

Gonzalez left Sunset Ranch for Breen.  On route, Gonzalez called her supervisor, Melissa Locketz, at 1:12 p.m.  Locketz is a registered nurse, referred to as RN.  Locketz told Gonzalez to call 911 unless Student's health plan stated otherwise.  Gonzalez did not call 911.

At round 1:12 p.m., Moriah Warfield, health aide at Breen Elementary, entered Student's classroom.  In her role as a health aide, Warfield helped when students had minor injuries or were ill, although she was generally not in classrooms.  She was not a nurse.  Warfield was CPR certified, and at the time of the hearing was attending college to obtain a degree in health administration.  At the hearing, Warfield testified with great candor and earnestness as to her observation of events and was honest that she had limited familiarity with Student.  Warfield did not have much contact with Student prior to December 2, 2021.  She might recognize him if she saw him on campus but was not familiar with his behavior or communication.  Warfield's testimony as to the actions the adults took in the classroom was highly credible and is given significant weight.

Student continued to sit in the bean bag chair with an iPad in his lap.  He occasionally touched the screen.  Student was rocking, with a clenched jaw, and tried to hold the hands of staff.  Warfield did not perceive the situation as alarming.  To her, Student did not appear injured and his rocking did not seem uncontrolled.

Warfield asked Aguilar for Student's health care plan so they could determine what to follow for his care.  Aguilar looked multiple places in the classroom and found some papers, but not Student's health care plan of October 5, 2021.

At 1:15 p.m., Warfield contacted nurse Julianne Gonzalez by phone.  Gonzalez suggested they call Parent.  Warfield sat with Student while Flanagan tried to call Parent.  Neither Flanagan nor main office assistant Joy Gladden could reach Parent.  Warfield

and Flanagan thought Student might be having symptoms of a seizure, but they were unsure and wanted advice from someone with more medical expertise.

At 1:18 p.m., Student continued to sit in a bean bag chair, alert and shaking, rocking back and forth.  He was shivering as if he was cold.  He put down his iPad and gestured, which staff interpreted as the sign "help."  Warfield put her hands on his to keep him calm. Gonzalez entered the classroom and assessed the situation.  Gonzalez was not familiar with Student.  She did not know his baseline behavior or communication, or whether his current behavior was normal for him.  Gonzalez did not perceive Student as having a seizure at that time.  In her estimation, Student had motor control because he was holding an iPad and gesturing with his hands.  She saw his rocking as a controlled motion more akin to a self-stimulatory behavior, referred to as a stim, than a convulsion.  She believed he was trying to communicate, which showed intact cognitive functioning.  However, Gonzalez was not sure of the seizure protocol for Student and wanted to check his health care plan.  Around 30 minutes after Student began displaying symptoms of seizures, Gonzalez found a digital copy of Student's health plan using a classroom Chromebook.

At 1:29 p.m., Melissa Locketz, lead nurse, arrived at Student's classroom.  Locketz observed Student as alert, with a strong pulse and unlabored breathing.  Locketz asked if school staff had called 911, and they said they had not.

At around 1:34 p.m., Parent arrived at Student's classroom.  Parent was upset. Warfield met Parent outside the classroom and explained they felt Student had a seizure.  Parent asked Warfield to get out of the way and made her way through into the classroom.  Student was sitting in the bean bag chair.  At that point, school staff perceived Student as alert, although less animated than usual.  Parent perceived Student

as clearly having a seizure.  His eyes were bulging and darting and his head was in a locked position.  His teeth clenched.  He was unresponsive when Parent said his name.

Parent asked school staff if they understood he had a seizure, and why they had not called 911.  Locketz asked if she wanted them to call 911.  Parent said no, that she would take it from there.  Parent believes that Flanagan tried to stop her from leaving the classroom, asking again if they should call 911.  Parent told Flanagan to get out of her way or it would be a bigger problem for them.  Parent removed Student from the classroom and took him to her car where Student's father was waiting.

At 2:21 p.m., Student arrived at the Emergency Department of Kaiser Permanente in Roseville, California.  At hearing, the parties spent significant time disputing whether Parent called 911, and whether he arrived at the hospital via ambulance.  These facts are not relevant to the sole legal issue in this due process hearing, which is whether Rocklin implemented Student's health care plan.  However, Student's condition at the hospital is relevant to his condition that day.  Hospital records confirm that Student was having a flurry of seizures on December 2, 2021.

When Student arrived at the Emergency Department, he was unresponsive, with weak but diffuse seizures on the right side of his body.  The Emergency Department physicians diagnosed Student with Status Epilepticus, which is a seizure lasting longer than five minutes.

Student had poor respiration and was unresponsive on an oxygen face mask.  He was drooling, with clenched teeth.  Neurologically, he was unresponsive and had no limb movement in response to stimulation.  His blood pressure, pulse, and temperature were all elevated due to the flurry of seizures he was experiencing.

16

The Emergency Department doctors treated Student with oxygen, Keppra, and Ativan. After a few hours in the Emergency Department, Student's seizures subsided. His temperature and pulse also subsided as his seizures remitted. Parent felt Student was back to baseline. Student left the emergency room with Parent at 6:44 p.m., tired, but no longer having seizures.

In the afternoon and days following the medical incident of December 2, 2021, Flanagan drafted a google document explaining the events and the timing. Warfield, Gonzalez, Locketz, and Miller all edited the google document to add their recollections.

Rocklin failed to follow Student's health care plan on December 2, 2021. Classroom teacher Brandi Flanagan was responsible for implementing Student's health care plan. However, on December 2, 2021, Flanagan did not reference Student's health care plan because the plan was not readily available. Flanagan's testimony to the contrary is not credible. Similarly, Aguilar's testimony that classroom staff referenced a written copy of the health care plan was not credible as she appeared coached, and upon examination appeared to understand that she had been caught telling a mistruth. The incident notes from December 2, 2021, as well as credible testimony from Gonzalez and Warfield, are reliable proof that staff could not find the paper copy of Student's health plan in the classroom.

Rocklin staff did not recognize the symptoms of Student's seizure activity even though he exhibited all the signs described in his health care plan. For the 34-minute period of Student's medical incident on December 2, 2021, Rocklin staff was concerned, alarmed, and attentive to Student. However, school staff failed to time his seizures or contact Parent and the nurse in a timely manner. Furthermore, Rocklin failed to have a copy of Student's health plan readily available, which resulted in staff failing to identify

his seizure symptoms and take the requisite steps, including calling 911 after five minutes.

Rocklin's failure to follow Student's health care plan, incorporated by reference within the October 5, 2021 IEP, amounted to a significant failure to implement Student's IEP.  (See *Van Duyn v. Baker School Dist.* (9th Cir. 2007) 502 F.3d 811, 815, 822.)  By not following the health plan, Rocklin failed to implement the health and nursing services in Student's IEP and did not adequately manage his health problems on the school site. (Ed. Code § 56363, subd. (b)(12); Cal. Code Regs., tit. 5, § 3051.12(a)(2).)  Rocklin failed to protect Student's safety and dignity at school by allowing Student to suffer from a flurry of seizures over a 34-minute at school while failing to implement the steps required by his health plan.  (Cal. Code Regs., tit. 5, § 3051.12(b)(3)(B).)

## CONCLUSIONS AND PREVAILING PARTY

Pursuant to California Education Code section 56507, subdivision (d), the hearing decision must indicate the extent to which each party has prevailed on each issue heard and decided.

Issue 1: Rocklin Unified School District denied Student a FAPE by failing to follow Student's health plan incorporated by reference in the October 5, 2021, IEP.  Student prevailed on the legal issue in this matter.

## REMEDY

Under federal and state law, courts have broad equitable powers to remedy the failure of a school district to provide FAPE to a disabled child.  (20 U.S.C. § 1415(i)(1)(C)(iii); Ed. Code, § 56505, subd. (g); *see School Committee of the Town of Burlington, Massachusetts v. Dept. of Education* (1985) 471 U.S. 359, 369 [105 S.Ct. 1996,

18

85 L.Ed.2d 385] (*Burlington*).)  This broad equitable authority extends to an Administrative Law Judge who hears and decides a special education administrative due process matter.  (*Forest Grove School Dist. v. T.A.* (2009) 557 U.S. 230, 244, fn. 11 [129 S.Ct. 2484, 174 L.Ed.2d 168].)

In remedying a FAPE denial, the student is entitled to relief that is appropriate in light of the purposes of the IDEA.  (20 U.S.C. § 1415(i)(2)(C)(iii); 34 C.F.R. § 300.516(c)(3) (2006).)  The purpose of the IDEA is to provide students with disabilities a free appropriate public education which emphasizes special education and related services to meet their unique needs.  (*Burlington, supra,* 471 U.S. 359, 374.)  Appropriate relief means relief designed to ensure that the student is appropriately educated within the meaning of the IDEA.  (*Student W. v. Puyallup School Dist.* (9th Cir. 1994) 31 F.3d 1489, 1497 (*Puyallup*).)  The award must be fact-specific and be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.  (*Reid ex rel. Reid v. District of Columbia* (D.C. Cir. 2005) 401 F.3d 516, 524.)

A school district may be ordered to provide compensatory education or additional services to a student who has been denied a FAPE.  (*Park v. Anaheim Union High Sch. Dist.* (9th Cir. 2006) 464 F.3d 1025, 1033.)  Compensatory education is a prospective award of educational services designed to catch-up the student to where he should have been absent the denial of a FAPE.  (*Brennan v. Regional School Dist. No. 1* (D.Conn. 2008) 531 F.Supp.2d 245, 265; *Orange Unified School Dist. v. C.K.* (C.D. Cal. June 4, 2012, No. SACV 11–1253 JVS(MLGx)) 2012 WL 2478389, *12.)  An award of compensatory education need not provide a day-for-day compensation.  (*Puyallup*, supra, 31 F.3d 1489, 1496-1497.)  The conduct of both parties must be reviewed and considered to determine whether equitable relief is appropriate.  (*Id.* at p. 1496.)

19

Student is entitled to compensatory education for Rocklin's failure to follow Student's health plan incorporated by reference in the October 5, 2021, IEP, which denied him a FAPE.  Student did not provide any evidence regarding compensatory education.  However, administrative law judges have broad equitable powers to fashion an appropriate remedy.  From December 3, 2021, to December 17, 2021, Student did not attend school because Parent did not trust the school to follow his health plan or keep him safe at school.  Student missed 11 days of school following the medical incident and is entitled to compensatory education for those days.  Pursuant to his IEP of October 5, 2021, Student was entitled to 330 minutes per day of specialized academic instruction.  Student is awarded 60 hours of compensatory education for the 3630 minutes of education he missed in the days after Rocklin failed to implement his health plan.

Additionally, staff training is ordered because the facts strongly support a finding that Rocklin staff was not sufficiently trained in identifying seizure symptoms, having health plans readily available, and implementing health plans as required under the IDEA. (See *Park v. Anaheim Union High Sch. Dist.* (9th Cir. 2006) 464 F.3d 1025, 1033: in an appropriate case, training of district staff may be ordered.)

## ORDER

1. Within 30 days of being notified of Parent's selection, Rocklin shall contract with a certified non-public agency of Parent's choice to provide 60 hours of compensatory education to be used in any educationally-related area of Parent's choice.  Parent may choose more than one certified non-public agency to provide the compensatory education.  Any compensatory education services not used by December 31, 2023, shall be forfeited by Student.

2. Within 90 school days of this decision, Rocklin shall provide 6 hours of training to its staff on the topics of seizures, seizure symptoms, how to respond if seizure symptoms are suspected, and individualized health care plans.  The training shall be presented to all Rocklin teachers, paraprofessional classroom aides, and health technicians.  The training shall be presented by health care professional(s) with expertise in seizures, and attorneys or administrators with knowledge of the laws regarding individualized health care plans.  The trainers shall not be current employees of Rocklin, or attorneys who represented Rocklin in this matter.

3. All other requests for relief are denied.

## RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within 90 days of receipt.

*Cararea Lucier*


Cararea Lucier
Administrative Law Judge
Office of Administrative Hearings

# PROOF OF SERVICE

# OAH CASE NUMBER 2021120714

    I, <u>Aleecia Alvarado</u>, declare as follows: I am over 18 years of age and am not a party to this action. I am employed by the Office of Administrative Hearings. My business address is 2349 Gateway Oaks Drive, Suite 200, Sacramento, CA  95833. On <u>April 27, 2022</u>, I served a copy of the following documents in the action entitled above:

# DECISION

to each of the persons named below at the addresses listed after each name by the following methods:

Brittany Marshall and Earl Vickers

6664 Lonetree Blvd.

Rocklin, CA  95765

Marcella L. Gutierrez

GUTIERREZ, PERRY & VILLARREAL, LLP

marcy@gpvlaw.com;trystan@gpvlaw.com

Sheila Bayne

LAW OFFICES OF SHEILA C. BAYNE, ESQ.

sheila@autismlaws.com;jim@autismlaws.com

- Secure e-File Transmission: Based upon agreement of the parties to accept service through the OAH Secure e-file Transfer System, I caused the documents to be sent to the persons at the email addresses listed above.
- Overnight Delivery: I enclosed the above-described documents in a sealed envelope or package addressed to the persons at the addresses listed above, and placed the envelope or package with overnight delivery fees paid at an office or a location regularly utilized for collection and overnight delivery by an authorized overnight delivery courier.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was executed at Sacramento, California on April 27, 2022.


*Aleecia Alvarado*
Aleecia Alvarado, Declarant